**John Lee HENRY, Petitioner–Appellant,**

v.

**Herbert J. SPECKARD, Respondent–Appellee,**

**Howard R. Relin, Esq., Intervenor–Respondent–Appellee.**

No. 1174, Docket 93–2295.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1994.

Decided April 25, 1994.

---

Steven M. Statsinger, New York City (Legal Aid Society Federal Defender Services Unit, New York City on the brief), for appellant.

Loretta Courtney, Rochester, NY (Howard R. Relin, Dist. Atty. for Monroe County, Rochester, NY on the brief), for respondent-appellee.

Before: KEARSE and LEVAL, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Petitioner John Lee Henry, a New York State ("State") prisoner convicted on one count of sexually assaulting his girlfriend's nine-year-old daughter, appeals from a judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Chief Judge,* denying his petition pursuant to 28 U.S.C. § 2254 (1988) for a writ of habeas corpus on the ground that the state trial court's restriction on cross-exami-

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

nation violated his constitutional right to confront his accuser. The district court denied the petition on the ground that, although the restriction violated Henry's Sixth Amendment right of confrontation, the error was harmless. On appeal, Henry challenges the district court's conclusion that the error was harmless. For the reasons below, we affirm.

## I. BACKGROUND

For most of the period from 1984 to May 1989, Henry lived in Rochester, New York, with Sonya Harvey. Between them during that period, they had five children: Harvey's two children from a prior relationship; Henry's two children from a prior relationship; and one child born of the Henry–Harvey relationship. A second child of that relationship was born in July 1989. Ebony was one of Harvey's children.

On May 14, 1989, Harvey overheard Ebony, then nine years old, arguing with Henry's two children over two pieces of paper, which Harvey discovered to be notes written by Ebony. After reading those notes Harvey asked if there were any other notes Ebony wished to show her. Ebony brought out one other note she had written, which Harvey also read. According to Ebony, the notes described two incidents, one in October 1988, and the other in April or May 1989, in which Henry had sexually abused her.

After discussing the notes, Harvey and Ebony confronted Henry, and Harvey asked Ebony to repeat the statements she had just made to Harvey. According to Harvey, Henry looked "shocked" and "scared" but apparently maintained his innocence; he suggested that Ebony be examined at a local hospital. Henry, Harvey, Ebony, and the other children all went to the hospital.

At the hospital, while Ebony was being examined by Dr. Mark Nawrocki, Harvey spoke with police officers, who suggested that she have Henry take the other children home. At that time, Harvey did not know the results of the examination. After the examination was completed, Harvey and Ebony were taken to the police station to file a report of rape and sodomy. Harvey called Henry from the police station; at the sugges-

tion of the police, she told Henry the examination results were not ready.

When Harvey returned home, accompanied by five or six police officers, she found that Henry had left. Henry telephoned her later in the day, asked her to take care of his children, and stated, "I'm not going to jail for something I did not do." Henry was apprehended months later in Georgia.

### A. *The State–Court Trial*

Henry was charged with two counts of first-degree sodomy relating to the assault alleged to have occurred in October 1988, and one count of first-degree sodomy and one count of first-degree rape relating to the assault alleged to have occurred in April or May 1989. One of the 1988 sodomy counts was dismissed during trial. At the trial, the prosecution called as its principal witnesses Harvey, Dr. Nawrocki, and Ebony.

Harvey testified chiefly to the events described above, *i.e.,* discovering the notes, confronting Henry, and taking Ebony to the hospital. On cross-examination, she also testified that she frequently went out at night to play Bingo and that on most of those occasions, Henry baby-sat with the children. Harvey also testified that on at least one occasion when she left the house for a short time she had asked Ebony to baby-sit for the younger children. Harvey said Ebony had not complained.

Dr. Nawrocki testified that during his examination of Ebony, which was the first examination he had ever conducted of a preteen-aged suspected victim of sexual abuse, he had initially been of the view that no sexual abuse had occurred. He further testified, however, that after consultation with "a person who is considered the expert in town by the medical community at large" but who had not personally examined Ebony, Dr. Nawrocki concluded that sexual abuse had occurred. The defense presented an opposing medical expert, Dr. Leslie Walker, who testified that based on his review of the medical records and his telephone conversation with Dr. Nawrocki he believed that no vaginal penetration had occurred; on cross-examination, however, Dr. Walker conceded that his definition of penetration varied from

the definition that was "acceptable ... in the profession."

Ebony testified that Henry had sexually abused her in October 1988 and again in April or May 1989. She described the events in detail. She testified that her notes (which were not admitted in evidence) described what had happened. She had written the first notes in October 1988, shortly after the first assault. She did not tell her mother about either of the assaults until May 1989.

When Henry's attorney William Clauss cross-examined Ebony, he attempted to question her as to her baby-sitting chores, seeking, as he later informed the court, to show that she resented being required to baby-sit and therefore had a motive to fabricate her charges against Henry. Clauss began his inquiry of Ebony as follows:

> Q. .... Did your mom ever in that time ever go out and play Bingo, for example, at night?
>
> A. Yes.
>
> ....
>
> Q. Did [Henry], did he ever go out and do things at night, leave the house?
>
> A. Yes, sometimes.
>
> Q. Were you ever in charge of watching the littler kids?

(Trial Transcript ("Tr.") 197.) At this point, the prosecutor interrupted with an objection. The trial court sustained the objection but allowed Clauss to make an offer of proof by questioning Ebony outside the presence of the jury.

In the proffer session, Clauss elicited the following testimony from Ebony:

> Q. Were you ever put in charge of the other kids by your mother to watch over them?
>
> A. Yes.
>
> Q. And did you try to do a good job when you were put in charge?
>
> A. Yes.
>
> Q. And did that mean changing the babies who needed to be changed?
>
> A. At that time I don't think my brother Rayshon was born.
>
> Q. Were you in charge of like fixing bowls of cereal and things like that?

> A. I can't remember.
>
> Q. But you do remember you were the one who was in charge, right?
>
> A. Yes.
>
> Q. And did you ever feel bad that you were forced to do that?
>
> A. No, because I wasn't forced. My mother would ask me if I would do it.
>
> Q. Did you ever feel like it was unfair that you had to do these things?
>
> A. No.
>
> Q. Did you enjoy doing them?
>
> A. Yes.
>
> Q. You weren't mad at your mother because she put you in charge of the kids?
>
> A. No.
>
> Q. Did you ever tell your grandmother that?
>
> A. Huh?
>
> Q. Did you ever tell your grandmother that you were upset because you had to watch the kids while your mother and John Henry used to do things together?
>
> A. No.
>
> ....
>
> Q. Did you ever tell her that you were upset or unhappy that your mother was putting you in charge of the kids while she did fun things with John Henry?
>
> A. No.
>
> Q. Never told her that?
>
> A. No.
>
> Q. Are you sure?
>
> A. Yes.
>
> Q. You have talked with her about this though, haven't you?
>
> A. About what?
>
> Q. About this trial.
>
> A. No.
>
> Q. Not at all?
>
> A. Because my mother is mad at her and she's not talking to her.

(Tr. 199–201.)

Clauss informed the court that he wished to elicit this testimony from Ebony in the presence of the jury "on this particular limited issue of motive to lie." (Tr. 202.) The

prosecutor persisted in her objection, and the court again sustained it, rejecting Clauss's arguments:

THE COURT: I think your record is preserved. I don't believe it is relevant, and you are confined by her answers which suggest it is not relevant.

MR. CLAUSS: I think, though, Judge, I should be allowed to ask these questions. They are limited in nature. They are based on a good faith basis that I don't know made the record before. I had a telephone conversation with Mrs. Liz Harvey [Ebony's grandmother] in which she told me that it was her opinion, based on conversations that she had had with Ebony, that Ebony—that this never happened and that Ebony was upset because she was forced to watch the other kids and take care of the other kids while Sonya and John Henry did fun things. That's a personal conversation I had. I think I should at least—I know I'm stuck with her answers, that's clear.

THE COURT: Well, if her answers are in the negative, then the only inference the jury can take is the negative. The question posed with a negative answer is that it didn't occur, and you're limited to those answers. So you want to suggest something to the jury that you can't prove—

MR. CLAUSS: No.

THE COURT:—and that they can't accept as proof, or am I missing something?

MR. CLAUSS: No. I think the fact that a witness may answer in the negative doesn't alter the fact that the demeanor and the manner in which the answer is given is also subject for the jury's evaluation. I mean, people can, and often do in trials, answer in the negative to questions put in good faith by attorneys. Just because the answer is negative doesn't mean that the jury might not conclude that the answer is not an honest one, and they may use the witness's demeanor and the length of time the witness takes to answer these questions in making that conclusion, and I think that's why it ought to be done in the presence of the jury.

THE COURT: Okay. Your application is denied.

(Tr. 202–204.)

When cross-examination of Ebony in the presence of the jury resumed, Henry's attorney questioned her along other lines at considerable length, seeking to reveal, *inter alia,* any inconsistencies between her testimony and statements she had made to the police officers in her accusations. In addition, he sought to show that Ebony had a motive to fabricate her accusation of Henry because she felt her mother was not paying sufficient attention to her and she was jealous of Henry. Showing her one of the notes she had written, Clauss elicited the following testimony:

Q. Did you ever write a letter that said, "I feel like I am nobody. She makes love to him."

A. Yeah, I wrote it.

. . . .

Q. So you do remember writing that?

A. Yes.

Q. And that's because you felt like you were nobody; is that right?

A. Yes, but that wasn't the reason.

. . . .

Q. What did you mean when you wrote I felt like I was nobody?

A. My mother wasn't paying any attention to me.

Q. Because she was paying more attention to John Henry?

. . . .

A. No.

Q. Was she paying more attention to some of the other kids and that made you feel bad?

A. No.

Q. Did you ever observe—did you ever see or observe your mother make love to John Henry?

A. No.

Q. But you knew that she did, right?

A. Yes.

(Tr. 261–63.)

In summation, Henry's attorney argued to the jury that Ebony's testimony was not

believable and that he had brought out at least five inconsistencies in her testimony or between parts of her testimony and her prior statements to the authorities. He pointed out that Henry was not required to show Ebony's motive for not being truthful and urged the jury not to impute to him any such burden.

The jury returned a verdict finding Henry guilty on the undismissed charge of sodomy in connection with the October 1988 incident; it returned verdicts of not guilty on the sodomy and rape charges relating to the 1989 incident.

Henry appealed his conviction to the Appellate Division, Fourth Department, which concluded that, although the trial court's exclusion of the proffered cross-examination was error, that error was harmless. *People v. Henry,* 179 A.D.2d 1061, 579 N.Y.S.2d 806 (4th Dept.1992) (mem.). Leave to appeal to the Court of Appeals was denied. *People v. Henry,* 79 N.Y.2d 1002, 584 N.Y.S.2d 456, 594 N.E.2d 950 (1992).

### B. *The Present Habeas Proceeding*

In 1992, Henry commenced the present proceeding in the district court, seeking a writ of habeas corpus on the ground that the trial court's ruling violated his confrontation rights and that the error was not harmless. In a Decision and Order dated March 31, 1993, the district court found the error harmless. In making this determination, the court "reviewed the record as a whole" and considered, *inter alia,* the medical testimony, the otherwise extensive cross-examination defense counsel had been allowed, and the evidence of Henry's flight after being confronted with Ebony's accusations.

The district court dismissed the petition, and this appeal followed.

## II.  DISCUSSION

### A.  *The Confrontation Clause Violation*

Both the State's Appellate Division and the district court found, and the State does not dispute here, that the trial court's refusal to permit Henry's counsel to question Ebony as to whether she had resented being asked to baby-sit was error. We agree.

■ The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, *see Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), guarantees the defendant in a criminal prosecution the right to confront the witnesses against him. This "means more than being allowed to confront the witness physically," for " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940) (emphasis in Wigmore)); *see Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986).

■ The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination. *Davis v. Alaska,* 415 U.S. at 316–17, 94 S.Ct. at 1110–11; *see also Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) (cross-examination is especially important where the principal evidence consists of the testimony of individuals who might, *inter alia,* be "motivated by malice, vindictiveness, intolerance, prejudice, or jealousy"). Thus, though the Confrontation Clause does not deprive the trial judge of all discretion to set limits on the cross-examination of a prosecution witness for potential bias, *see Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435 (court has "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant"), the court "must allow some cross-examination of a witness to show bias," *United States v. Abel,* 469 U.S. 45, 50, 105 S.Ct. 465, 468, 83 L.Ed.2d 450 (1984); *see also Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 482–83, 102 L.Ed.2d 513 (1988) (per curiam); *Alford v. United States,* 282 U.S. 687, 691–92, 51 S.Ct. 218, 219–20, 75 L.Ed. 624 (1931); *Harper v. Kelly,* 916 F.2d 54, 57 (2d Cir.1990) (improper to preclude inquiry into whether identification

witness's fearful state of mind at time of robbery may have interfered with his perception), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991).

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1436 (quoting *Davis v. Alaska,* 415 U.S. at 318, 94 S.Ct. at 1111). A complete bar on examination into bias would impermissibly deny the jury information "central to assessing [the witness's] reliability," *Delaware v. Van Arsdall,* 475 U.S. at 677, 106 S.Ct. at 1434; *see id.* at 679, 106 S.Ct. at 1435.

■ The witness's motivation and potential bias are especially important areas for cross-examination when the witness is the complainant and the sole witness to the acts of which she accuses the defendant. We can see no justification in the present matter for the trial court's refusal to allow Henry's attorney to ask Ebony whether she had resented being asked to baby-sit. There was plainly a foundation for the proposition that she had performed baby-sitting chores. Henry's attorney had established through Harvey's trial testimony that Ebony had on at least one occasion been asked to do so; and in response to counsel's questioning outside the presence of the jury, Ebony agreed that on occasion she had done so. Henry was entitled to explore whether the request that she do so had kindled in her a resentment that flared into an untrue accusation.

■ The trial court's view that the jury could not infer such a resentment because during the proffer Ebony denied being resentful was mistaken. Although a party may not prove an issue on which he has the burden of proof by simply calling the opposing party to the stand, posing the pertinent questions, and urging the jury to disbelieve the witness's unfavorable answers, *see, e.g.,*

*Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1965–66, 80 L.Ed.2d 502 (1984); *United States v. Zimmitti,* 850 F.2d 869, 874 (2d Cir.1988); *United States v. Tyler,* 758 F.2d 66, 70 n. 3 (2d Cir.1985), it is entirely open to a party to try to counter his opponent's case by asking questions designed to expose, *inter alia,* an opposing witness's bias. The witness may well answer bias-probing questions in the negative; but the matter of whether her answers should be believed or disbelieved is within the sole province of the jury.

Accordingly, we agree that the trial court's prohibition against Henry's questioning of Ebony with regard to baby-sitting violated Henry's right of confrontation.

### B. *Harmless Error Analysis*

■ When a reviewing court concludes that the trial judge has improperly curtailed cross-examination, in violation of the defendant's confrontation rights, it should not reverse automatically but should instead apply harmless-error analysis. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless...." *Delaware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438; *see also Tinsley v. Kuhlmann,* 973 F.2d 163, 165–66 (2d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993); *Harper v. Kelly,* 916 F.2d at 57. On collateral review of a state court conviction, an error of constitutional magnitude is to be considered harmless unless it had a " 'substantial and injurious effect or influence in determining the jury's verdict,' " *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). An error may be found to have had such an effect even if, absent the error, the evidence was sufficient to support the conviction. *Moore v. United States,* 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976). The principal factors to be considered in assessing the effect of the confrontation error are (1) the importance of the witness's testimony, (2) whether that testimony

was cumulative, (3) the presence of contradictory evidence on material points, (4) the extent of cross-examination otherwise permitted, and (5) the strength of the evidence against the defendant. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438; *Tinsley v. Kuhlmann*, 973 F.2d at 166.

Although we regard the present case as a close one, we ultimately conclude that the error was harmless. The first two factors suggest that the error was not harmless. Plainly, Ebony's testimony as a whole was important and not cumulative, for she was the only person, other than Henry, who had actual knowledge of whether the alleged crimes had occurred. The remaining factors, however, point toward the contrary conclusion, for the circumstantial evidence strongly supported Ebony's accusations. The medical evidence was consistent with her charges. Further, the circumstances in which her accusations first came to light were suggestive of genuineness rather than of vindictiveness or an effort to gain attention. Ebony did not seek her mother out in order to volunteer the accusations. Rather, she wrote notes to herself; her mother chanced to overhear Ebony and two of the other children arguing; and only in that way did Harvey discover the notes Ebony had written. If Ebony were fabricating her charges with a view to gaining a larger share of her mother's attention or with a view to ridding the family of Henry's presence, the secretion of notes of such charges for a lengthy period (seven months after the 1988 incident) would seem remarkably devious for a nine-year-old, and an unlikely approach for a person of any age. Finally, Ebony's accusations were supported by the evidence of Henry's reactions to the initial confrontation with Ebony, which included his flight prior to being informed of the results of the medical examination.

Most importantly, we consider the court's restriction on the cross-examination of Ebony to have had little significance in light of the cross-examination that was permitted. The fact that Ebony had occasionally been asked to baby-sit had been brought out in the cross-examination of her mother. The court's restriction on the cross-examination of Ebony extended only to that one small area. Thus, Henry's attorney was allowed to probe Ebony's version of the events thoroughly and intensively; in his summation, he argued that he had elicited numerous inconsistencies. He was also given wide latitude to ask Ebony other questions probing her bias or potential motivation to lie. Accordingly, Clauss cross-examined her as to whether Henry's relationship with her mother caused her to feel jealous and neglected. He was permitted to bring out that Ebony knew her mother made love to Henry, that her "mother wasn't paying any attention to me," and that she had therefore written in one of her notes, "I feel like I am nobody. She makes love to him." Thus, even if Ebony had testified before the jury that she did not like being asked to baby-sit, that testimony would have been insignificant alongside the testimony that was in fact elicited, to the effect that she craved her mother's attention, was jealous of Henry, and, in light of her mother's relationship with Henry, felt like a "nobody."

On the whole, we conclude that the jury had an adequate basis to assess Ebony's credibility and to draw fair conclusions as to whether or not she might have fabricated the serious charges she made against Henry and whether or not the charges were proven beyond a reasonable doubt. Indeed, the jury declined, for whatever reason, to find Henry guilty on two of the three charges submitted to it. If the excluded line of questioning could have produced a more telling effect in light of the record as a whole, we might be persuaded that allowing it could have swayed the jury to acquit on the third count as well. We are unable to conclude, however, in light of the evidence that was in fact elicited, that the unavailability of the evidence that could have been realized through the proposed questioning as to whether Ebony had resented occasionally being asked to baby-sit had any substantial influence on the jury's conclusion that on one 1988 sodomy count Henry was guilty.

## CONCLUSION

We have considered all of Henry's arguments on this appeal and have found in them

no basis for reversal. The judgment of the district court is affirmed.

LEVAL, Circuit Judge, concurring:

I also vote to affirm the district court's dismissal of the petition, but for a slightly different reason. While I agree with Judge Kearse's conclusion that the error committed was harmless, in my view it was not an error of constitutional magnitude. Not every erroneous limitation on a defendant's cross-examination constitutes a deprivation of the right of confrontation guaranteed by the Sixth Amendment. I agree with my colleagues that the trial judge was mistaken in disallowing the defendant's effort to cross-examine Ebony about her babysitting, as a possible source of bias. I believe, however, that this error under the state law of evidence did not implicate federal constitutional rights or, consequently, federal habeas corpus relief.

In *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court found a Confrontation Clause violation where a state trial court had "prohibited *all* inquiry [by the defendant] into the possibility that [a prosecution witness] would be biased...." *Id.* at 679, 106 S.Ct. at 1435. That is the ruling we interpret in deciding whether Henry's petition sets forth a valid federal constitutional claim.

The language of the *Van Arsdall* opinion is somewhat ambiguous as to where the line is drawn between erroneous restrictions that do, and those that do not, violate the Confrontation Clause. The Court asserted:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Id.* at 680, 106 S.Ct. at 1435 (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). This sentence could be read to mean two very different things. The more inclusive meaning would be that *any* prohibition of a proper question designed to show a bias violates the Confrontation Clause. A narrower reading would be that restrictions of cross-examination to show bias do *not* violate the Constitution unless they are sufficiently gross and broad that they effectively "prohibit[ ] [the defendant] from engaging in" cross-examination to show the bias.

I construe the Court's opinion to come closer to the latter than the former. First, the Court stressed that the trial court "prohibited *all* inquiry," *id.* 475 U.S. at 679, 106 S.Ct. at 1435 (emphasis in original), into the possibility of bias. The opinion continues, "By thus cutting off all questioning about an event that [might have] ... furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." *Id.* In addition, the Court explained,

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)).

I understand this discussion to mean that even erroneous restrictions on the showing of bias through cross-examination do not rise to the level of constitutional violations unless the defendant is effectively deprived of the opportunity to impeach the witness through the claimed bias. This interpretation is further supported by the description of the

holding in Justice Marshall's separate opinion. Justice Marshall wrote, "The Court today properly holds that a *complete denial* of cross-examination designed to explore the bias of a prosecution witness violates the Confrontation Clause...." *Id.* 475 U.S. at 686, 106 S.Ct. at 1439 (Marshall, J., dissenting on other grounds).

Other cases in which federal courts have found Confrontation Clause violations in state court trials have likewise involved gross foreclosure of the opportunity to show a bias or disability, rather than partial curtailment. In *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), for example, the defendant, charged with rape, maintained that his sexual acts with the complainant had been consensual. He sought to show by cross-examination that the complainant maintained an intimate relationship with·his half-brother, so that he could argue that her accusation of rape stemmed from a desire to protect this relationship by denying her consensual intimacy with the defendant. The Supreme Court held that preclusion of this line of cross-examination violated the Confrontation Clause. While noting that the trial court may impose "reasonable limits" on defense questioning to expose bias, the Court held it was "beyond reason" to preclude questioning with "such strong potential to demonstrate the falsity of [the complainant's] testimony." *Id.* at 232, 109 S.Ct. at 483. In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the trial court precluded the defendant from bringing out a prosecution witness's status as a juvenile offender on probation. The Court held that the Confrontation Clause had been violated because the ruling prevented the jury from considering whether the witness's testimony was biased to curry favor with the police or to shift suspicion from himself. *See also United States v. Abel,* 469 U.S. 45, 50, 105 S.Ct. 465, 468, 83 L.Ed.2d 450 (1984) ("the Confrontation Clause of the Sixth Amendment requires a defendant to have *some* opportunity to show bias on the part of a prosecution witness") (emphasis added).

I do not believe the trial judge's erroneous evidentiary rulings in this case sufficiently precluded the defendant's efforts to impeach the witness for bias to violate the Confrontation Clause. As set forth in Judge Kearse's thorough opinion, the defendant was given wide latitude to cross-examine Ebony, probing for possible bias and motivation to lie. The cross-examination included Ebony's awareness that her mother made love to Henry, her feeling that her mother "wasn't paying any attention to me," and that she had written a note saying, "I feel like I am nobody. She makes love to him." The questioning explored whether Henry's relationship with Ebony's mother caused her to feel jealous and neglected. The cross-examination thus exposed the jury to facts from which they could infer bias on Ebony's part. Furthermore, the only fact precluded from the cross-examination—that Ebony's mother had asked her to babysit—had been brought out in the examination of the mother and was thus available to support an argument of bias arising from the imposition of this possibly unwelcome duty, even without the defendant having asked Ebony about it.

I therefore conclude that the erroneous curtailment of the cross-examination of Ebony was neither so broad nor so important as to constitute a violation of the Confrontation Clause. I would therefore rule that Henry failed to establish a cause of action under 28 U.S.C. § 2254. Accordingly, in my view, the petition should have been dismissed without reference to the degree of harm that might have been caused by the trial court's erroneous evidentiary ruling.

MILTON POLLACK, Senior District Judge, dissenting:

I respectfully dissent.

Constitutional error in excluding the proffered cross-examination is conceded by the state court, the district court and the intervenor in oral argument before this court, but relief has been denied on the ground that, on the whole record, such error was harmless.

Each reviewing court has said that the trial judge erroneously violated defendant's constitutional "opportunity" to confront the sole witness to the alleged crime with inquiries proposed to show a motive to fabricate her accusations of sodomy against the defendant. No corroboration of any of the sodomy

accusations was adduced from any source; there was no medical evidence presented nor any circumstantial indication of the actuality thereof. The district judge noted that prior to the trial, petitioner's counsel had spoken to the child's grandmother and

> [b]ased upon her conversations with Ebony, it was the grandmother's opinion that Ebony fabricated the allegations of sexual abuse due to her jealousy of the petitioner.

*Henry v. Speckard,* No. 92–CIV–6384, at 5 (W.D.N.Y. March 31, 1993). The trial judge prohibited defense counsel from cross-examining Ebony in this area on the ground of irrelevancy.

Each reviewing court eschewed a reversal on the constitutional error by speculating that the preclusion of the proffered interrogation was harmless error. The protective cloak afforded to the nine-year-old accuser may be understandable but it compromised the jury's function in such a close case, and, I believe that under all the facts and circumstances in this case, including the selective verdict of the jury, had a "substantial and injurious effect in determining the jury's verdict." *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). There was no evidence in the case sufficient to support a conviction on any count other than the testimony of the child. The jury indicated disbelief of the credibility of the accuser by exonerating the defendant from similar accusations of sexual abuse, including the purported incident of sodomy in 1989 and an alleged incident of rape in 1989. To have allowed the precluded cross-examination might well have tipped the scales in favor of the defendant on the 1988 sodomy count. There was no medical evidence on either accusation of sodomy.[1] The matters singled out in the opinion of Judge Kearse said to constitute circumstantial evidence of guilt are at best equivocal and the latitude given to counsel in other respects does not make up for the denial of the opportunity to present, head-on, motive to lie about the accusations, and to confront Ebony before the jury about her conversations with her grandmother. The seriousness of the

charges is reason enough to have afforded the defendant every constitutional opportunity to test the infant accuser's credibility.

I would reverse.

---

1. The medical testimony related solely to the rape charge which the jury threw out. There was no medical testimony to be considered on the sodomy charge.