April 19, 2018

**Supreme Court**

No. 2017-159-C.A.

(K1/14-679A)

State                                    :

v.                                   :

Eugene Danis.                            :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Eugene Danis. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.**  On November 19, 2014, a grand jury indicted Eugene Danis (Danis or defendant) on charges of one count of first-degree child molestation sexual assault, in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.2, and one count of the sale or distribution of photographs of a minor suggesting that the minor engaged in, or is about to engage in, a sexual act, in violation of G.L. 1956 § 11-9-1(b).  A Kent County Superior Court jury convicted the defendant on both counts on February 9, 2016.  On appeal, the defendant argues that the trial justice deprived him of his constitutional rights to confront and cross-examine the complaining witness.  For the reasons stated herein, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The defendant was charged with sexually abusing his stepdaughter, Veronica.[1]  At trial, Veronica testified that her mother began dating defendant when Veronica was about seven years old, and he moved in with Veronica and her mother some time before they were married.  Once they were married in 2009, Veronica testified that she began calling defendant "dad."

In 2012, Veronica moved with her mother and defendant to defendant's aunt's house in West Warwick.  The defendant's aunt passed away that same year.  Because defendant was not working at that time, Veronica recalled, he would watch her after school when her mother was at work.

Although Veronica had a positive relationship with defendant prior to his aunt's passing, she testified that, once she was twelve years old, her relationship with him began to change. Specifically, Veronica remembered defendant speaking about topics that "a normal father wouldn't really talk about," such as "sexual" topics.  For example, Veronica testified that defendant would enter the bathroom while she was showering and speak to her through the curtain, even opening the curtain one time while he was shirtless, pretending as though he planned to get in the shower with her.

Veronica testified that, on a number of occasions, defendant showed her some pornographic pamphlets that arrived in the mail and told her that the women in the pictures made money from posing nude.  Eventually, Veronica stated, defendant had a few conversations with her about making money if she posed for such pictures.  After those conversations, Veronica agreed to take such pictures, explaining that she did so because "in [her] twelve-year[-]old mind"

---

[1] We use pseudonyms to identify the complaining witness and other minors referenced in this opinion.

she thought she would "get money" if she did so—money that she could use to purchase "an I-pad, electronics, and stuff like that."

According to Veronica, she posed for defendant about five times—once on defendant and her mother's bed, and the other times in the basement. The first time she posed on the bed was in the fall of 2012. She wore no clothes and had on only high-heeled shoes, and defendant instructed her on how to position herself to expose her breasts and vagina to the camera. After defendant took the pictures with the camera on Veronica's cell phone, Veronica removed the SD card and put it in the printer because she was "pretty sure" defendant "couldn't figure out how to work the printer * * *." Then, defendant told her to delete the photographs from the phone and the SD card. On cross-examination, Veronica explained that defendant told her that he was sending the printed pictures to the owner of Playboy, who he said was a friend of his.

Veronica said defendant used a disposable camera to take the downstairs photographs. She recollected that defendant told her to use lubricant and a vibrator so they could get more money for the pictures; Veronica remembered being "reluctant" to use the vibrator because she had "never been * * * penetrated before." Nevertheless, Veronica testified, defendant "put it in" her, but she held it while he took the pictures. The entirety of the photo shoot lasted about one hour.

Veronica recalled telling defendant around her thirteenth birthday that she did not want to take pictures any longer. After that, Veronica testified that defendant asked her to wear a "strap-on" that her mom had "tried * * * on[,]" but Veronica declined.

At this point, Veronica testified, she did not tell her mom what was happening because she believed her mother was happy with defendant and if she said anything, they would break up,

and defendant told Veronica that she would be taken away from her mother. She also testified that he told her he would be put in jail and "wouldn't be [her] dad" anymore.

After Veronica decided she no longer wanted to take the pictures, defendant became more strict with her, which caused tension between them, culminating in a fight over Veronica's failure to clean out her guinea pig's cage. During that fight, Veronica recalled that defendant accused her of not keeping her promises. In response, she showed him a camera she owned at the time, to indicate that she had kept her promise regarding the pictures, but defendant responded that that was in the past and did not matter anymore.

Veronica's friend, Nadia, was present at the time of the fight, and both girls went for a walk, during which time Veronica explained to Nadia what defendant had done to her. Nadia expressed to Veronica that she did not know what to do, but that Nadia could explain the situation to Nadia's grandmother. After Nadia did so, her grandmother called Veronica's mother and told her to come to Nadia's house. When Veronica's mother learned what had happened, she returned home to confront defendant about Veronica's allegations.

During the course of the trial, the trial justice held a voir dire hearing on the issue of permitting defense counsel to question Veronica regarding prior sexual-abuse allegations she purportedly made against her biological father when she was five years old. The state attempted to keep this evidence out at trial, while the defense argued that it was relevant to Veronica's motive to lie about sexual assault by father figures in her life. The trial justice ultimately precluded defense counsel from pursuing this line of questioning, and this decision is at issue in this appeal.

Veronica's mother also testified at trial. She testified that Veronica's biological father had "sporadic" visitation with Veronica from 2000 to 2005. She testified that, in 2007,

4

defendant moved in with her and Veronica at their Coventry residence. At that time, Veronica's grandmother lived with them and was primarily responsible for the care of Veronica while Veronica's mother was at work. Eventually, Veronica's mother and defendant moved with Veronica to the West Warwick house, at which time defendant was unemployed and took over watching Veronica in the mornings and afternoons.

Veronica's mother recalled that, in April 2014, her daughter wanted to go to a birthday party, but defendant said that she could not go because she had not cleaned her guinea pig's cage. After the argument between Veronica and defendant ended, Veronica's mother took Veronica and her friend, Nadia, to a store, after which the girls went to Nadia's house. Soon after, Veronica's mother remembered receiving a phone call from Nadia, asking her to come to Nadia's house because Nadia's grandmother wanted to speak to her. When Veronica's mother arrived at the house, she discovered Veronica crying, sitting in the passenger's seat of Nadia's grandmother's car. When Veronica calmed down, Veronica told her that defendant had taken nude photographs of her and that she did not want to return home.

When Veronica's mother first confronted defendant, he initially denied the allegations, and he stated, "'I knew this was coming. Get [Veronica] so we can talk.'" Veronica's mother met Veronica at another store, where Nadia's grandmother had taken the two girls, and, in the car, Veronica shared details with her mother regarding the sexual assaults—including that defendant used a vibrator on her.

After Veronica's mother went back to her house for a second time, she again spoke with defendant; she testified that he said, "'It was all her idea.'" Veronica's mother told defendant to move out of the house, and he complied. The next day, Veronica's mother called the police to

5

give a statement, and the police confiscated two laptops and Veronica's old cell phone; at some point later, she gave police defendant's old cell phone as well.

Nadia also testified at trial. She recalled the day of Veronica's argument with defendant over failing to clean her pet's cage and not attending a birthday party; she also recalled Veronica telling her that defendant had taken nude pictures of her. Nadia testified that the girls took a walk together, during which Veronica told her that defendant had taken the pictures of her and touched her.

Officer Trenna Beltrami[2] of the West Warwick Police Department testified on behalf of the state. She recalled being dispatched to a West Warwick address because Veronica's mother had requested to speak with a female police officer to report her husband having taken nude photographs of her daughter. Officer Beltrami stated that Veronica's mother told her that her daughter had explained that, in the photographs, a vibrator was used as well as a "strap-on sex toy," which had been thrown in the trash. When she spoke with Veronica, Officer Beltrami remembered that she was told that the photographs were taken upstairs at first, and the rest were taken in the basement of the house. During that house call, Officer Beltrami also retrieved a "strap-on" and a bottle of lubricant from the trash can.

Detective Jonathan Izzi of the West Warwick Police Department testified that he had reviewed the statements that Veronica and her mother had given to Officer Beltrami, and he visited their house to follow up on the case. Veronica's mother gave Det. Izzi two laptop computers and defendant's old cell phone, which Det. Izzi turned over to the Rhode Island State Police Forensic Computer Unit, along with Veronica's cell phone. However, Brittnee Morgan, a digital forensic analyst for the Rhode Island State Police, testified that, when she conducted the

---

[2] At the time she responded to the call, Officer Beltrami's last name was Heemond.

analysis on the devices on June 2, 2014, she did not recover any pictures of a young, nude female.

At the end of the trial, the jury convicted defendant on both counts, and defendant moved for a new trial. The trial justice denied the motion for a new trial and sentenced defendant to fifty years' imprisonment, with thirty-five years to serve and the balance suspended with probation on the first count, and five years' imprisonment with three to serve and the balance suspended with probation on the second count, both to run concurrently. The defendant timely appealed to this Court.

## II

### Standard of Review

Upon review of a trial justice's evidentiary ruling, we only overturn that decision where it "constitutes an abuse of [his or her] * * * discretion that prejudices the complaining party." *State v. Manning*, 973 A.2d 524, 530 (R.I. 2009) (quoting *State v. Hallenbeck*, 878 A.2d 992, 1015 (R.I. 2005)). "[T]he exercise of discretion by the trial justice in limiting the scope of cross-examination will not be disturbed absent a clear abuse of that discretion." *State v. Ogoffa*, 159 A.3d 1043, 1049 (R.I. 2017) (quoting *State v. Walsh*, 731 A.2d 696, 698 (R.I. 1999)). While criminal defendants possess the constitutional right "to cross-examine prosecution witnesses," such a right "is far from absolute." *Manning*, 973 A.2d at 530 (quoting *State v. Merida*, 960 A.2d 228, 234 (R.I. 2008)). This constitutional right "is tempered by the dictates of practicality and judicial economy; trial justices are authorized to exercise sound discretion in limiting the scope of cross-examination." *Id.* (quoting *Merida*, 960 A.2d at 234).

## III

### Discussion

On appeal, defendant appears to limit his argument to what he alleges is the trial justice's violation of his Sixth Amendment right to cross-examine the complaining witness regarding her allegations against her biological father. He argues that it precluded him from exposing Veronica's bias and motive to lie.[3]

The Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution "guarantee individuals accused of criminal charges the right to confront and cross-examine any adverse witnesses who testify against them." *Manning*, 973 A.2d at 530 (quoting *State v. Dorsey*, 783 A.2d 947, 950 (R.I. 2001)). Through cross-examination of a witness, an attorney has the ability "to test a witness's veracity and credibility and to discredit [his or her] testimony as is necessary." *State v. Pettiway*, 657 A.2d 161, 163 (R.I. 1995). However, this is not an unfettered right, and "it may be circumscribed within reasonable parameters of relevance in the exercise of the trial justice's discretion." *Dorsey*, 783 A.2d at 950. As long as there is an opportunity for "'sufficient cross-examination to satisfy a defendant's constitutional confrontation rights,' the trial justice may exercise his sound discretion in limiting further cross-examination." *Manning*, 973 A.2d at 531 (quoting *State v. Brown*, 709 A.2d 465, 473 (R.I. 1998)).

---

[3] While the state addresses both this argument and an argument under Rule 608 of the Rhode Island Rules of Evidence, defendant states in his reply brief that he is focused only on the Sixth Amendment right to cross-examine to demonstrate motive to lie, rather than the general credibility of the witness implicated by Rule 608. *See State v. Manning*, 973 A.2d 524, 534, 535 (R.I. 2009) (recognizing the difference between evidentiary rulings based on impeachment of the general credibility of a witness and cross-examination related to a complaining witness's bias or motive).

The United States Supreme Court has recognized that "establishing the witness's motives or bias in testifying is * * * a key part of the constitutionally protected right to cross-examination," *Dorsey*, 783 A.2d at 951 (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)), but "the evidence offered to prove motivation or bias must be related to the charge the defendant is facing." *Dorsey*, 783 A.2d at 951. Accordingly, "evidence of a complaining witness's similar accusations of wrongdoing against others may be used to challenge a witness's credibility with respect to the pending charges, regardless of whether those prior accusations ever were proved false." *Id.*; *see also State v. Oliveira*, 576 A.2d 111, 113 (R.I. 1990) ("The defendant's inability to prove that prior accusations were in fact false does not make the fact that prior accusations were made irrelevant."). In fact, "a trial justice lacks the discretion 'to completely (or virtually so) prohibit defense counsel from attempting to elicit testimony regarding bias on the part of the witness[.]'" *State v. Clark*, 974 A.2d 558, 575 (R.I. 2009) (quoting *State v. Tiernan*, 941 A.2d 129, 134 (R.I. 2008)). "[T]his includes relevant testimony that might be substantially outweighed by the evidentiary factors set forth in Rule 403 of the Rhode Island Rules of Evidence." *Id.*

Here, defendant argues that he should have been permitted to inquire as to Veronica's former sexual-abuse allegations against her biological father. *See Pettiway*, 657 A.2d at 163 (acknowledging the defendant's argument that his constitutional rights were violated when he was not allowed to show that the complaining witness "lodged sexual-abuse allegations against other men"). In *Pettiway*, we held that the defendant's right to confrontation was limited where he was foreclosed from inquiring into the complaining witness's pattern of alleging sexual abuse by her mother's boyfriends. *Id.* at 163-64. We acknowledged that it was "sheer speculation that the jury would have accepted this line of reasoning[,]" but we concluded that the jury was

"entitled to consider the defense theory so that [it] could make an informed judgment about the weight to place on [the witness's] testimony." *Id.* at 164.

However, in a number of sexual-abuse cases decided since *Pettiway*, we have determined that a defendant's right to confrontation was not violated where prior allegations were "fundamentally different" from the ones faced by that defendant. *See Dorsey*, 783 A.2d at 951, 953 (determining that a twenty-seven-year-old complaining witness's sexual-assault allegations against an unnamed boy were not similar to her allegations that her husband, the defendant, raped her because they were made when the witness was a young teenager regarding events that occurred when she was only seven years old); *see also State v. Botelho*, 753 A.2d 343, 345, 347 (R.I. 2000) (concluding that precluding cross-examination of a complaining witness was not abuse of discretion where the complaining witness's DCYF complaint against her father related to physical abuse, not sexual abuse like the complaints against the defendant, who was her mother's boyfriend).

Before ruling on the admissibility of the evidence at issue, the trial justice first heard argument from counsel, including defense counsel's Sixth Amendment argument. Initially, the trial justice decided that, despite the fact that he had some concerns as to whether Veronica was competent to make such allegations because she was very young at the time, "the [Sixth] [A]mendment rights of * * * defendant" required that defense counsel be permitted to ask about such events "in a very limited way."[4] The motive-to-lie argument that the defense first pursued

---

[4] The trial justice also mentioned Rule 403 of the Rhode Island Rules of Evidence at this point, explaining that:

> "In terms of the 403 analysis, the [c]ourt is going to make that determination on a question-by-question basis through objections. The [c]ourt does not believe as a whole the topic is so prejudicial. However, as the [c]ourt mentioned during argument on this, we

at trial was that Veronica made allegations against father figures when she was not happy with their actions.

After Veronica's direct examination, the trial justice decided that, based on the issue raised regarding Veronica's allegations against her biological father in "the oral motion in limine[,] it would be helpful for the [c]ourt to hear certain testimony of [Veronica] outside of the presence of the jury." During that voir dire hearing, defense counsel introduced records from St. Mary's Home for Children regarding behavior management services for Veronica when she was around five years old.

The March 2006 record, written by a Children Intensive Services clinician, states the following:

> "In December 2004 [Veronica] told her mother 'daddy touched my froggie' (vagina) * * *. [Veronica] also showed this worker a picture diary and explained the pictures to this worker. [Veronica] described one picture as her father touching her chest area and her private parts. [Veronica] also explained that one picture is her father burning in a fire and that she would not help him and was happy when he died."[5]

---

> can ask the witness in terms of her recollection and other things. It may be possible to attempt to refresh her recollection based on an answer to a question, but the information used to refresh her recollection is not evidence and will not be read to the jury any more."

[5] Similarly, a Children Intensive Services record from November 2005 states:

> "[Veronica] disclosed to her mother on (12/29/04) that her father touched her 'frog' (vagina) and drew a picture of her father putting his hands on her chest area and privates. [Veronica's mother] appropriately called the DCYF * * * hotline in December 2004 after [Veronica] disclosed to her. [Veronica] has not seen her father since the disclosure."

11

When defense counsel inquired as to whether she recalled making such allegations about her biological father, Veronica vacillated between remembering making the allegations and not recollecting anything other than what her mother told her had happened.

She first testified that she remembered only what she had been told:

> "Q:  * * * And do you have a memory of ever saying to anybody that your father touched you in an inappropriate way?
>
> "A:  I don't have a memory of saying it, but I have the memory of being told I have said that."

Then, she acknowledged that she did recall some things:

> "Q:  By reading the third paragraph does that refresh your memory today about something you said about your biological father?
>
> "A:  I remember saying my father did do something, but I clearly don't remember the exact words I said when I was five.
>
> "* * *
>
> "Q:  So it was clear that you remember telling your mom that your father touched you, he touched your froggy?  You have a memory of that?
>
> "A:  Yeah."

When the prosecutor questioned Veronica, she testified, in part, as follows:

> "A. Like, I remember one day that I was drawing out on this little like marker board something that happened with my father and that's all I remember.
>
> "* * *
>
> "Q:  * * * Do you remember having a conversation with your mom [when you were five years old] saying, Dad touched my chest or Dad touched my Froggy?
>
> "A:  I think I do remember saying, 'Daddy touched my Froggy,' but also that's what my mom told me too."

12

However, she later appeared to waver on whether she recalled drawing the pictures, when she explained the following:

> "Q: * * * The first exhibit * * * is some stick figures. It appears to be a female and a male, some appear to be holding hands, some appear to be touching in other places, but you recall drawing that?
>
> "A: No."

And later,

> "Q: * * * Do you remember your dad touching your breasts or vagina? Once again, when I say dad, I'm talking about your biological father. Do you have an independent recollection of him touching your vagina?
>
> "A: No."

At the end of the voir dire hearing, before the trial justice ruled on the motion *in limine*, defense counsel submitted a variation on its first theory as to Veronica's bias—"[W]henever somebody is coming into her life, another man, we sort of have the same pattern of making allegations." In ruling on the evidentiary motion, the trial justice principally relied on Rule 608(b)[6] and Rule 403,[7] as opposed to the Sixth Amendment, on which defendant now bases his

---

[6] Rule 608(b) provides:

> "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness'[s] character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

[7] Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

appeal. The trial justice found that Veronica had no recollection of "making any statement about recanting[,]" and he also noted that the purported incident occurred when Veronica was five years old, quite a number of years before defendant's alleged actions in the case at bar.

Finally, the trial justice reasoned as follows:

> "[T]he only potential evidence or information of this is a hearsay report certainly extrinsic evidence, and the [c]ourt can't get beyond the fact listening to that that other than this new theory that maybe the father came back in her life when she was [thirteen] that the only possible reason for this testimony would be to impermissibly put in the jury's mind that she somehow lied before and somehow she is lying in this case and that clearly is impermissible."

The trial justice concluded that, even assuming that the defense successfully got past a Rule 608 analysis, the trial justice would still keep the evidence out on Rule 403 grounds.[8] In conclusion, the trial justice ruled that Veronica's testimony was not admissible pursuant to Rule 608, and furthermore, it was unfairly prejudicial under Rule 403, and defense counsel was not permitted to engage in that line of questioning in the presence of the jury.

The purported motive defense counsel sought to elucidate was whether Veronica had a pattern of making sexual-abuse allegations against father figures whom she no longer wanted in her life. As was evidenced by her testimony during the voir dire hearing and highlighted by the

---

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[8] The trial justice explained:

> "What the [c]ourt has heard in terms of balancing any evidence that may come in with the evidence to the jury as opposed to the prejudicial [e]ffect certainly with there being no memory and no admissible evidence, the [c]ourt finds that any questioning or testimony would be more prejudicial and certainly the [c]ourt can advise the jury that the questions themselves are not evidence only the answers. The [c]ourt believes based on their [*sic*] being no foundation, we would ask the questions and have a sustained objection and we would never get there."

14

trial justice, it is clear that Veronica wavered back and forth regarding whether she remembered making such allegations against her biological father, or whether she was simply recalling what her mother had told her. While we do acknowledge that both allegations were of sexual misconduct against father figures, the accusations defense counsel sought to introduce were different from the specific allegations against defendant of sexual penetration and the taking of nude photographs. Not only did the abuse by her biological father purportedly occur when Veronica was five years old or younger, she also *made* the allegations at that tender age. *See Dorsey*, 783 A.2d at 953 (highlighting the difference between sexual-assault allegations made when the complaining witness was twenty-seven years old and sexual-abuse allegations made against someone other than the defendant when she was thirteen years old regarding events that occurred when she was only seven years old). The trial justice found that defense counsel failed to lay a foundation for his requested line of questioning—to demonstrate that Veronica remembered making these allegations. Based upon the lack of reliable testimony on the matter, it was well within the trial justice's discretion to not permit such questioning at trial.[9] *See Cookson v. Schwartz*, 556 F.3d 647, 655 (7th Cir. 2009) (upholding appellate court's affirmance of a trial justice's refusal to permit the defendant to inquire into victim's sexual-abuse allegations against another individual and reasoning that the trial justice had concluded that the victim "was not clever enough to concoct false allegations of sexual abuse[,]" which was a "factual determination on a matter so quintessentially within the province of a trial judge who had the

---

[9] While it was not addressed below or asserted by the parties, we pause to note that Rule 602 of the Rhode Island Rules of Evidence, in pertinent part, provides the following:

> "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself."

unique opportunity to observe the witness"); *but see Henry v. Speckard*, 22 F.3d 1209, 1215 (2d Cir. 1994) (determining that the defendant's right to confrontation was violated where the trial justice precluded the defendant from inquiring into whether the victim had a motive to make false allegations of sexual abuse against the defendant because she resented having to babysit her siblings).

Most fatal to defendant's case, however, is the fact that defense counsel failed to attempt this line of questioning once the jury was brought back into the courtroom. After he ruled on the oral motion *in limine*, the trial justice explained to defense counsel that, if he wanted to pursue, in his words, whether Veronica "had a memory of telling someone that her father had touched her froggy," he could "ask for a sidebar and we'll address it * * *." However, defense counsel never asked such questions, which constitutes a waiver of the issue. *See State v. Tejeda*, 171 A.3d 983, 1001 (R.I. 2017) ("We repeatedly have expressed our view that a failure to object in the vital context of the trial itself (except where the *in limine* ruling was unequivocally definitive) [constitutes] a waiver of the evidentiary objection and [is] therefore an issue that may not be raised on appeal." (quoting *State v. Andujar*, 899 A.2d 1209, 1222 (R.I. 2006))).

Moreover, "[w]hat is required for a fair trial is 'that *reasonable latitude* be given the cross-examiner. This latitude should include an opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried.'" *Ogoffa*, 159 A.3d at 1052 (quoting *Tiernan*, 941 A.2d at 134). At trial, defense counsel did have the opportunity to thoroughly attack Veronica's credibility when he asked her about the defendant's role as a disciplinarian in her life, including how strict she perceived him to be. In other words, the defendant was afforded an opportunity to inquire into Veronica's purported motive to bring false accusations against the defendant. *But see Oliveira*, 576 A.2d at 113 ("By not allowing

[the] defendant the opportunity to challenge [the complaining witness's] credibility, the trial justice inappropriately infringed on [the] defendant's Sixth Amendment rights of confrontation and effective cross-examination."). As such, we conclude that the trial justice did not abuse his discretion in precluding the admission of this evidence.

## IV

## Conclusion

For the foregoing reasons, the defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed. The papers in the case are remanded to the Superior Court.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Eugene Danis. |
| **Case Number** | SU-2017-0159-CA (K1/14-679A) |
| **Date Opinion Filed** | April 19, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For State: <br><br> Lauren S. Zurier <br> Department of Attorney General <br> For Defendant: <br><br> Kara J. Maguire <br> Office of the Public Defender |