**STATE**

v.

**Daniel DeOLIVEIRA.**

No. 2004–149–C.A.

Supreme Court of Rhode Island.

June 22, 2009.

---

Aaron L. Weisman, Stephen Regine, Department of Attorney General, for Plaintiff.

Paula Rosin, Office of Public Defender, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## O P I N I O N

Justice ROBINSON for the Court.

This case arises from a fatal motor vehicle accident which occurred on Interstate 95 in the early hours of January 31, 1999. The defendant, Daniel DeOliveira, appeals from a Superior Court conviction for driving under the influence of liquor or drugs, death resulting. Following his conviction after a jury trial, the defendant was sentenced to fifteen years imprisonment, with five years to serve and ten years suspended, as well as a five-year license suspension to commence upon his release from state custody. On appeal, the defendant challenges the admissibility of Breathalyzer test results, the denial of his motion for judgment of acquittal, and the denial of his motion for a new trial.

For the reasons set forth below, we affirm defendant's judgment of conviction and deny and dismiss the instant appeal.

### Facts[1] and Travel

### I

### The Events of January 31, 1999

The tragic motor vehicle collision giving rise to this case occurred on Interstate 95, southbound, on January 31, 1999. The clearest accounts of the incident were provided by three passengers of another vehicle, all of whom witnessed the accident.

The driver of that other vehicle, one Karen Bhatti, testified that she was traveling in a southerly direction in the low-speed (rightmost) lane of Interstate 95 as she approached the Lonsdale Avenue over-

---

1. The facts narrated in the following pages were adduced from the testimony of the multiple witnesses who testified at trial.

pass in Pawtucket. Ms. Bhatti observed a white pickup truck[2] quickly approaching from behind, so she decided to move to the center lane of the three-lane highway. She stated that the pickup truck caught her attention as it approached because at one point she noticed it swerving. Ms. Bhatti further testified that, as the pickup truck passed her on the right, she noticed a stopped Volkswagen Jetta on the right side of the road ahead; the Jetta was positioned partially in the breakdown lane and partially in the low-speed lane. She also testified that she observed a man standing at the open driver's side door of the Jetta.

Ms. Bhatti testified that the white pickup truck swerved towards the immobile Jetta and hit it. She did not recall seeing the brake lights of the pickup truck being illuminated, even though she could clearly see the rear of that vehicle at the time of the accident. Ms. Bhatti testified that she saw the pickup truck strike the victim (*viz.*, the man who had been standing beside the Jetta); the body of the victim lay on the hood of the pickup truck for a few seconds and then was thrown onto the pavement as that vehicle veered back into the rightmost lane of travel.

Ms. Bhatti followed the pickup truck until it stopped approximately one-half mile from the scene of the accident. She then stopped, exited her own vehicle, and walked back to the victim. She testified that other witnesses already were on the scene, one of whom took the victim's pulse and declared him to be dead. Ms. Bhatti further testified that defendant then walked over to the body and that the person who had attempted to take the victim's pulse said to defendant: "Look what you did. You killed him." Ms. Bhat-

ti testified that defendant, who she said was having some difficulty remaining upright, replied: "I didn't do it." Emergency rescue personnel responded to the scene shortly thereafter. The victim, who was later identified as Santos Juarez, age twenty-two, was pronounced dead at the scene.

Another prosecution witness, Cynthia Bootier, who was a passenger in Ms. Bhatti's minivan, also witnessed the accident. Ms. Bootier testified that she saw an apparently brokendown vehicle on the right side of the highway, with a person standing in front of the open door of the vehicle as though attempting to push it. She stated that the light was on in the vehicle and that it was "pretty visible."

Ms. Bootier further testified that a white Chevrolet Blazer passed Ms. Bhatti's van on the right. As the lanes of the interstate curved to the left, the Blazer proceeded straight and "just drove like there was nothing there." Ms. Bootier testified that, as the Blazer struck the disabled vehicle, she observed sparks and flying debris. She further testified that the Blazer continued driving despite having impacted the other vehicle; she added that Ms. Bhatti pursued the Blazer in her van in an attempt to ascertain its license plate number.

According to Ms. Bootier, when the Blazer eventually stopped, Ms. Bhatti's minivan also stopped. Ms. Bootier and the other occupants of the minivan descended from that vehicle and returned to the area of the accident; there she observed the victim lying on the ground.

A third passenger in Ms. Bhatti's vehicle, Diane Smith, also testified at trial. Ms. Smith provided an account of the acci-

---

**2.** It was established at trial that on the night of the accident defendant was driving a white Chevrolet Blazer, the victim was driving a grey Volkswagen Jetta, and Ms. Bhatti was driving a minivan.

dent that substantially parallels the testimony of Ms. Bhatti and Ms. Bootier. She testified that she had observed a Jeep-like vehicle behind Ms. Bhatti's van that was "weaving back and forth from the road," prompting Ms. Bhatti to move from the low-speed lane to the center lane of travel. After the accident and the brief pursuit of the Blazer, Ms. Smith also exited Ms. Bhatti's van and walked back to the victim. She testified that defendant joined them at the accident scene; she stated that he "smelled of alcohol and * * * was a little wobbly."

State Trooper Phillip Martin testified that he arrived at the accident scene between 1:20 a.m. and 1:30 a.m. on January 31, 1999. He was met by Pawtucket police and rescue personnel, who had already responded to the scene. At trial, he testified that he observed a heavily damaged grey Volkswagen Jetta parked partially on the merge strip to Interstate 95 southbound at the Lonsdale Avenue on-ramp and partially in the right-most lane of travel. He also observed the victim lying in the lane of travel on the Lonsdale Avenue ramp approximately seventeen feet in front of the Jetta.

Trooper Martin spoke with defendant, who was seated in the back of a Pawtucket police cruiser. Trooper Martin testified that, when he spoke with Mr. DeOliveira, he noticed that his eyes were bloodshot, his speech was slow and slurred, and his breath smelled of alcohol. Suspecting that defendant was intoxicated, Trooper Martin asked him to submit to several field sobriety tests, and defendant agreed. Trooper Martin testified that defendant failed all of those tests.

Trooper Martin further testified that he read defendant his Miranda[3] rights and placed him under arrest for driving while intoxicated. The defendant was then transported to the state police barracks in Lincoln, where he was again informed of his Miranda rights.

According to Trooper Martin's testimony, defendant consented to a Breathalyzer test,[4] and a two-phase test was performed. Dennis Hilliard, director of the State Crime Laboratory, testified that Mr. DeOliveira's blood alcohol content at 3:08 a.m. (the time of the first test) was 0.164 and that his blood alcohol content was 0.157 at 3:47 a.m. (when the second phase of the test was performed).

In due course, defendant was indicted for driving while intoxicated, death resulting, in violation of G.L. 1956 § 31–27–2.2.

## II

### The Motions to Suppress

Prior to trial, defendant moved to suppress certain statements that he made while speaking with police officers—both prior to being read his rights at the scene of the accident and after his arrest. The defendant claimed that he was in custody while seated in the back of the Pawtucket police patrol car and that any statements he made at that time should have been suppressed on the ground that he had not yet been given his Miranda warnings. The defendant further argued that statements which he made at the police station after having been read his rights should also be suppressed because of the earlier improper questioning. The state voluntarily declined to use any of said statements at trial. Accordingly, there is nothing for us to decide with respect to those statements.

---

3. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. The defendant signed a written form memorializing his consent to the Breathalyzer test.

The defendant also sought to suppress the results of the Breathalyzer test administered at the state police barracks in Lincoln, arguing that his consent to take the test was invalid because the police failed to inform him that the victim had died and that he would therefore be facing a charge of driving while intoxicated, death resulting—a significantly more serious offense than driving while intoxicated. At the pretrial suppression hearing, Trooper Martin testified that, at some point after the first phase of the Breathalyzer test, but prior to the second phase, defendant had inquired as to the condition of the victim. Although Trooper Martin was aware that the victim was dead, he simply told defendant in response to a question that the victim "was not doing well." Trooper Martin explained that he responded in that manner because he did not want to upset defendant, who appeared to him to be in a "little bit of shock" as a result of the collision and arrest. At the pretrial suppression hearing, defendant testified that, if he had known that the victim was dead, he would have requested that a lawyer be present during the Breathalyzer test or he would have withheld his consent to the test. The trial justice was not persuaded by this argument and concluded that defendant voluntarily consented to the Breathalyzer test because he believed that it would exonerate him.

### III

### The Trial

The defendant's case was tried to a jury in the Superior Court for Providence County from May 9 through May 14, 2001.

In addition to the witnesses whose testimony has already been discussed, the jury also heard the testimony of State Trooper Thomas Peck, who testified in the capacity of one familiar with technical accident reconstruction. Trooper Peck testified that, based upon his examination of the accident scene, at the time of impact the front driver's side tire of the victim's vehicle was positioned eighteen inches into the low-speed lane of travel while the rear driver's side tire protruded twelve inches into the low-speed lane of travel. The rest of the vehicle was within the right-hand breakdown lane. Trooper Peck further testified that, based on the location of one of the victim's boots, which was discovered underneath the front left tire of his vehicle, he concluded that the victim was standing beside the Jetta when he was struck. After being struck, the victim's body came to rest ninety-eight feet from his vehicle.

Trooper Peck also testified as to the physical characteristics of the highway at the time of the crash. In particular, Trooper Peck testified that the low-speed lane of travel is twelve feet wide and that the speed limit on that stretch of highway is fifty miles per hour. He further testified that, at the time of the crash, the highway was "well lit" by properly functioning "overhead * * * halogen-type lights," allowing a line of sight of 500 feet. Trooper Peck noted that he had found no evidence that defendant had braked his vehicle at any time prior to the accident.

The defendant called a single witness, Dr. Jau Wu, an expert in accident reconstruction. Doctor Wu testified that the victim's vehicle was partially in the slow lane of travel and that its open door extended almost four feet into the twelve-foot lane of travel. He further testified that, as a result of the positioning of the Jetta, defendant could not have avoided striking that vehicle. On cross-examination, however, Dr. Wu conceded (1) that he did not take defendant's alleged intoxication into account and (2) that defendant could have avoided the accident by steering his vehicle twelve inches to the left.

On the fifth day of trial, May 15, 2001, the jury returned a verdict of guilty. On May 21, defendant moved for a new trial; the motion was heard on June 6 and denied that same day. On July 19, 2001, the trial justice sentenced defendant to a fifteen-year term of incarceration at the Adult Correctional Institutions, with five years to serve and ten years suspended. The defendant timely appealed his conviction to this Court.

On appeal, defendant argues that the state failed to meet its burden of showing, by clear and convincing evidence, that defendant knowingly, intelligently, and voluntarily waived his right to decline the Breathalyzer test. Specifically, defendant alleges that the Breathalyzer test results should have been excluded because (1) the police elicited incriminating statements from him without first advising him of his rights and (2) the police later withheld from him the fact of the death of the victim. The defendant also contends that the evidence adduced by the state at trial was insufficient to prove beyond a reasonable doubt that his operation of his motor vehicle was the proximate cause of the victim's death.

## Analysis

## I

### Admission of the Breathalyzer Test Results

The defendant raises two arguments challenging the admission of his Breathalyzer test results at trial. First, defendant claims that the trial justice erroneously admitted his Breathalyzer test results because, pursuant to his understanding of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) and *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the statements that he made to Trooper Martin at the scene of the accident before he was given *Miranda*

warnings vitiated his consent to the Breathalyzer test (which consent was given after defendant had been read his *Miranda* rights). Second, defendant argues that his consent to the Breathalyzer test was not knowing, intelligent, and voluntary because the police knowingly withheld from him the fact that Mr. Juarez had died as a result of the accident and that defendant would therefore be facing a more serious charge than driving under the influence of alcohol. We consider both arguments to be unavailing.

■ In reviewing the denial of a motion to suppress evidence in a situation such as this, we employ the clearly erroneous standard of review. *See In re Kean*, 520 A.2d 1271, 1276 (R.I.1987); *In re John N.*, 463 A.2d 174, 176 (R.I.1983).

## A

### Defendant's *Elstad/Seibert* Argument

■ Pursuant to this Court's frequently articulated raise-or-waive rule, we do not consider at the appellate level issues that were not properly presented before the trial court. *See, e.g., State v. Hak*, 963 A.2d 921, 927 (R.I.2009); *State v. Bouffard*, 945 A.2d 305, 311 (R.I.2008). An important corollary to the requirement that issues first be raised at the trial court level is that "a general objection is not sufficient to preserve an issue for appellate review; rather, assignments of error must be set forth with sufficient particularity to call the trial justice's attention to the basis of the objection." *Union Station Associates v. Rossi*, 862 A.2d 185, 192 (R.I.2004); *see also State v. Anderson*, 752 A.2d 946, 948 (R.I.2000).

■ Raising the argument for the first time on appeal, defendant contends that the United States Supreme Court's hold-

ings in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643, (2004),[5] should have been applied by the trial justice so as to bar the admission of defendant's Breathalyzer test results at trial.[6] At the May 9, 2001 suppression hearing before the trial justice, defendant pointed to the *Elstad* opinion *only* with respect to the admission of the **statements** that he made to the police after he was given his *Miranda* warnings. Significantly, he never made a similar argument with respect to the Breathalyzer test results.

The defendant's reliance on *Seibert* is misplaced. Both *Seibert* and *Elstad* involved *oral statements* by a defendant, not Breathalyzer test results (nor any other type of nontestimonial evidence). In *Elstad,* the United States Supreme Court took care to note that the "Fifth Amendment, of course, is not concerned with nontestimonial evidence." *Elstad,* 470 U.S. at 304, 105 S.Ct. 1285. In fact, during the suppression hearing, defendant's trial counsel explicitly distinguished his *El-*

*stad* argument with respect to defendant's statements (made after he was *Mirandized*) to police from his argument concerning the admissibility of defendant's Breathalyzer test results. The Superior Court took up the issue of the admissibility of the test results only after the discussion of the admissibility of defendant's statements, including the applicability of *Elstad,* was concluded. We are, therefore, confident that defendant's trial counsel would not have prevailed on a *Seibert*-based argument even had that case been available at the time that the motion to suppress was argued before the trial justice.

It is self-evident that the constitutional principles implicated in *Elstad* were well-known to defendant's counsel at the time of trial, but he opted not to invoke those principles when he sought to suppress the Breathalyzer results. Having failed to raise those issues with respect to the admissibility of defendant's Breathalyzer test results before the trial justice below, we must consider them waived for the purposes of our review.

---

5. In *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."

In *Missouri v. Seibert,* 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the United States Supreme Court held that *Miranda* warnings given mid-interrogation, after defendant had already given an unwarned confession to police, were ineffective. The defendant in that case was interrogated by police without having been given her *Miranda* warnings. After eliciting a confession from the defendant, the police then gave her the required warnings and thereafter had her repeat her confession. The Supreme Court held that any confession repeated after warnings were given should be inadmissible at trial.

6. This Court has recognized a narrow exception to the raise-or-waive rule when "basic constitutional rights are concerned." *State v. Donato,* 592 A.2d 140, 141 (R.I.1991); *see also State v. Bouffard,* 945 A.2d 305, 311–12 (R.I.2008). In such cases, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *State v. Breen,* 767 A.2d 50, 57 (R.I.2001). We have asked ourselves if this narrow exception would be applicable to the case at bar due to the fact that the decision in *Seibert* was rendered after the trial in this case; ultimately, however, for the reasons set forth in the text, we have concluded that the above-referenced narrow exception is inapplicable.

## B

## Defendant's Waiver of His Right to Refuse to Take the Breathalyzer Test

■ At the May 9 suppression hearing, defendant argued against the admissibility of the Breathalyzer test results on the ground that his consent to the test was not knowing, intelligent, or voluntary; in support of that argument, he alleged that the police had "affirmatively misrepresented" the true nature of the charge that he would be facing—namely driving while intoxicated, death resulting. Specifically, defense counsel pointed to the fact that, when defendant inquired as to the victim's condition, Trooper Martin informed him that Mr. Juarez was "not doing very well"—whereas the victim was, in fact, known to be deceased. The defendant offered his own testimony to the effect that he would have asked for an attorney and refused the Breathalyzer test if he had known that Mr. Juarez was dead and that he would therefore be facing the more serious charge of driving while intoxicated, death resulting.

This Court has held that an individual charged with driving while intoxicated must be informed of the following: (1) his or her *Miranda* rights; (2) his or her right to be examined by a physician of his choice; (3) his or her right to refuse to submit to a Breathalyzer examination; and (4) the consequences attendant on refusal to consent to the test. *State ex rel. Town of Middletown v. Anthony,* 713 A.2d 207, 212 (R.I.1998).

We have also held that the taking of breath samples is a search and seizure within the meaning of the Fourth Amendment. *State v. Locke,* 418 A.2d 843, 846–47 (R.I.1980) (citing *State v. Bentley,* 92 Wis.2d 860, 286 N.W.2d 153, 155 (Ct.App.

1979) and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

■ Pursuant to the principles set forth in *Schmerber,* however, a Breathalyzer test is considered a search incident to a lawful arrest and is, therefore, deemed reasonable within the meaning of the Fourth Amendment. *Locke,* 418 A.2d at 849. In *Locke,* this Court further noted that the consent of the defendant is irrelevant to a consideration of the *constitutionality* of a Breathalyzer test; but this Court in *Locke* further held that, pursuant to the *statutory* mandate set forth in G.L. 1956 § 31–27–2(b),[7] a valid consent must be obtained from a suspect before the test results may be used at trial. *Locke,* 418 A.2d at 849. In the case of *In re Kean,* 520 A.2d 1271 (R.I.1987), this Court recognized that the right to refuse to take a Breathalyzer test is a statutory, not a constitutional, right; but the Court nonetheless applied the same criteria to the waiver of that right as is used in analyzing the waiver of constitutional rights—namely, whether the waiver was knowing, intelligent, and voluntary. *Id.* at 1274. We shall conduct our analysis accordingly in the instant case.

At the suppression hearing, after considering the testimony of both Trooper Martin and defendant as well as the arguments of counsel, the trial justice stated as follows:

"* * * I'm absolutely convinced [defendant] was given the full panoply of the contents of [the standardized] rights form by the trooper, in oral fashion. I believe [Trooper Martin] fully when he says he handed [the form] to the defendant to read it. I believe the trooper when he said it appeared to him that the defendant was, in fact, at least in his opinion, reading it. His eyes were fixed

---

**7.** The relevant language is currently codified at G.L. 1956 § 31–27–2(c).

upon the paper. I don't have any problem · in satisfying myself that the man was provided the full panoply of rights * * *."

The trial justice further found that the prosecution had adequately proven that defendant. understood the nature of his rights—and, in particular, understood his right to decline the Breathalyzer test. The trial justice noted, in pertinent part, as follows:

"[The defendant] exhibited a calm demeanor at the station. He never asked Trooper Martin any questions about the rights form * * *. * * * He was permitted to make a phone call; elected to call his wife. And, throughout the evening, according to Martin, the defendant was understandable, his responses to Martin's questions were appropriate to the questions that were asked of the defendant.

"This defendant never objected to taking the Breathalyzer test; never requested the test be stopped. And, indeed, as made clear by the defendant on the stand just some minutes ago, he very much wanted to take that test because, in the defendant's words, he didn't think he was 'that bad,' in other words he didn't think he was as drunk as the officer apparently thought he was after he had, in the officer's eyes, failed the sobriety test. * * * [T]he defendant thought he had passed that sobriety test; he was going to go to the station and was going to demonstrate to these officers that he was not drunk, and that he had a belief that taking a Breathalyzer test would, in fact, support him. As it turned out, a very mistaken belief.

"The defendant said during his testimony on the direct examination that he

was 'better off taking the test.' So, to me that evidence is a clear indication that he knew he had a choice."

We are mindful of the fact that the trier of fact is in the best position to assess the relative credibility of witnesses. *See State v. Humphrey,* 715 A.2d 1265, 1273 (R.I.1998); *see also State v. Woods,* 936 A.2d 195, 198 (R.I.2007) (quoting *National Labor Relations Board v. Erie Brush and Manufacturing Corp.,* 406 F.3d 795, 802 (7th Cir.2005) ("The hearing officer was a front row observer for this testimony, giving her a far greater edge in making credibility determinations than we could ever hope to have in reviewing the black and white transcript.")). Having reviewed the testimony presented at the suppression hearing, we are unable to perceive any indication in the record that the above-summarized analysis by the trial justice was clearly erroneous.

In addition, we agree with the trial justice's conclusion that the fact that the police did not affirmatively or explicitly inform defendant that Mr. Juarez had died as a result of the accident did not taint or abrogate the knowing, intelligent, and voluntary waiver by defendant of his right to refuse the Breathalyzer test.[8] The trial justice dispensed with defendant's argument in that regard as follows:

"[The defendant] has got to know—he had to be deaf, dumb, and blind, and stupid not to know that the man who was hit in this accident, lying prone, face down on the highway, bleeding to the point where your client considers giving him CPR, is not in very good shape. And the officers—although they didn't tell him the man had expired—certainly told him he wasn't 'doing very well.' An understatement, yes, but one that the defendant could easily understand, hav-

---

**8.** It will be recalled that a bystander told defendant: "Look what you did. You killed

him."

ing viewed the scene after having just hit this fellow with his vehicle."

In further support of his ruling on this issue, the trial justice cited the opinion of the United States Supreme Court in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). In that case, the Supreme Court stated, in pertinent part, as follows:

> "[A] valid waiver [of a defendant's *Miranda* rights] does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might ... affec[t] his decision to confess.' * * * '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' *Id.* at 576–577, 107 S.Ct. 851 (quoting *Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).[9]

We are of the definite and firm conviction that defendant was fully informed of his rights by the police and that he nonetheless knowingly, intelligently, and voluntarily chose to submit to the Breathalyzer test. Consequently, the trial justice's denial of defendant's motion to suppress the results of that test was not clearly erroneous.

## II

## The Motion for Judgment of Acquittal and the Motion for a New Trial

### A

### The Motion for Judgment of Acquittal

■ The defendant argues that the trial justice erred in denying his motion for judgment of acquittal because, defendant contends, there was insufficient evidence to prove beyond a reasonable doubt that defendant's operation of his motor vehicle was a proximate cause of Mr. Juarez's death. We are unpersuaded by this argument.

■ In reviewing a trial justice's denial of a motion for judgment of acquittal, we employ the same standards as the trial court. *See State v. Hesford*, 900 A.2d 1194, 1200 (R.I.2006). We view the evidence in the light most favorable to the prosecution, giving full credibility to its witnesses, and drawing all reasonable inferences consistent with guilt. *Id.*; *see also State v. Otero*, 788 A.2d 469, 475 (R.I.2002). "If the evidence, viewed in this light, is sufficient to support a verdict of guilty beyond a reasonable doubt, the motion must be denied." *State v. Mondesir*, 891 A.2d 856, 861 (R.I.2006); *see also State v. Grant*, 946 A.2d 818, 826 (R.I.2008).

Essentially, defendant rests his argument on the contention that his collision with Santos Juarez was unavoidable due to the position of the victim's vehicle and the proximity of the van driven by Karen Bhatti in the center lane of travel. At trial, defendant offered the testimony of a single witness, Dr. Jau Wu, an accident reconstruction expert. Both Dr. Wu and Trooper Peck (who conducted the accident reconstruction for the state) agreed that Mr. Juarez's Jetta was stopped partially in the breakdown lane and partially in the lane of travel when it was struck by defendant's vehicle. Both witnesses further

---

9. In *State v. Forbes*, 900 A.2d 1114, 1119 (R.I.2006), we cited *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), in support of our conclusion that a police officer's failure to inform several defendants of the charges against them "does not automatically require a finding of involuntariness [with regard to the waiver by defendants of their fifth amendment privilege against self-incrimination], but is merely a single factor to be considered in light of all the evidence presented at the suppression hearing."

agreed that there were no skid marks at the scene of the accident—nor any other indications that the defendant attempted to brake before his vehicle struck the victim.

Doctor Wu testified that the victim's driver-side door was open at the time of the impact. He further testified that, in his opinion, it was not possible for defendant to avoid the collision because he did not have adequate time to react after seeing Mr. Juarez's vehicle. Additionally, Dr. Wu opined that defendant could not have avoided hitting the victim because Ms. Bhatti's minivan was in close proximity to defendant's truck in the neighboring lane; as a result, Dr. Wu submitted, defendant would have been unable to shift lanes so as to avoid the victim.

■ This Court has stated that a jury, in evaluating the testimony of an expert witness, is free to accept, reject, or accord whatever weight it deems appropriate to that testimony. *State v. Rieger*, 763 A.2d 997, 1004 (R.I.2001). Although a jury may not arbitrarily disregard uncontradicted and unimpeached expert testimony, such testimony "is to be given only such probative weight as the jury decides is appropriate." *State v. Cooke*, 479 A.2d 727, 731 (R.I.1984). In our judgment, the jury in the case at bar acted in accordance with these principles.

Moreover, the testimony of Dr. Wu was *not* uncontradicted and unimpeached. Extensive testimony was offered at trial concerning visibility on the roadway on the night in question, and the jury was shown a video of the accident scene as it appears during nighttime hours. In addition, Trooper Martin testified that the area in which the accident occurred was "pretty well lit." Karen Bhatti and Cynthia Bootier both testified that they had little difficulty seeing the victim and his vehicle as they approached the scene of the accident.

The state's accident reconstruction specialist, Trooper Peck, testified that the nighttime visibility on that stretch of highway was approximately 500 feet. On the basis of this evidence, a jury could reasonably conclude that the victim was clearly visible to defendant as he approached the scene of the accident.

Ms. Bhatti also testified that she was driving far enough behind defendant at the time of the accident that she was able to see his tail lights. Thus, a jury could have reasonably concluded that defendant in fact had room to move into the center lane of travel so as to avoid striking the victim.

Finally, it is noteworthy that Dr. Wu himself was largely in agreement with the findings of the police and (significantly) conceded (1) that he did not take defendant's alleged intoxication into account and (2) that defendant could have avoided the accident by steering his vehicle a mere twelve inches to the left.

Viewing this evidence in the light most favorable to the state, giving full credibility to its witnesses, and drawing all reasonable inferences consistent with defendant's guilt, we are satisfied that there was more than enough evidence submitted at trial to allow the jury to conclude beyond a reasonable doubt that the defendant's driving was *a* proximate cause (regardless of whether or not it was *the sole* cause) of Santos Juarez's death. *See* § 31–27–2.2(a).

## B

### The Motion for a New Trial

The defendant further contends that the trial justice erred in denying his motion for a new trial; he rests this contention on substantially the same rationale that we discussed in the previous section discussing his motion for judgment of acquittal.

When deciding a motion for a new trial, the trial justice must perform at least three analyses:

"First, he or she must consider the evidence in light of the charge to the jury, a charge that presumably is correct and fair to the defendant. Second, he or she must determine his or her own opinion of the evidence, and then weigh the credibility of the witnesses and other evidence and choose which conflicting testimony and evidence to accept and which to reject. Finally, the trial justice must determine whether he or she would have reached a different result from that of the jury based on an individual assessment and in light of the charge to the jury." *State v. Rivera*, 839 A.2d 497, 502–03 (R.I.2003).

If the trial justice agrees with the jury's verdict or believes that reasonable minds could differ, "the analysis is complete and the verdict should be affirmed." *Rivera*, 839 A.2d at 503. Further analysis must be conducted only when the trial justice does not agree with the jury verdict or does not agree that reasonable minds could differ as to the proper disposition of the case. *Id.* In that event, the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. *State v. Luanglath*, 749 A.2d 1, 4 (R.I.2000). If the trial justice so determines, then a new trial should be ordered. *See id.*

This Court will not disturb the decision of a trial justice who has employed the above-described analytical approach unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. McKenna*, 709 A.2d 1027, 1029 (R.I.1998).

In deciding the motion for a new trial, the trial justice conducted the required analysis, weighing the evidence adduced at trial and the credibility of the witnesses and choosing which evidence to credit and which to reject. Quite significantly, the trial justice found that the testimony of defendant's expert witness was not particularly helpful to defendant; he said: "The defendant's expert, Dr. Wu, in my view did not assist the defendant. * * * His testimony, frankly, supported the State's allegations."

Upon concluding his analysis, the trial justice found that "the jury's verdict was well-supported by the evidence. At best, * * * reasonable minds might differ as to the conclusion that was reached [by the jury]." In accordance with our law, he therefore denied defendant's motion for a new trial. *See Rivera*, 839 A.2d at 503 (describing the analysis required under our settled law). We perceive no indication in the record that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. The trial justice's denial of the motion for a new trial is therefore affirmed.

## Conclusion

For the reasons discussed herein, we affirm the judgment of the Superior Court. The record in this case may be remanded to the Superior Court.