**Supreme Court**

No. 2019-438-C.A.

(P1/16-3412A)

State                  :

v.                   :

Kunwar Chadha.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                              :

Kunwar Chadha.                  :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Kunwar Chadha, appeals from a June 20, 2019 judgment of conviction and commitment entered against him in Providence County Superior Court on two counts of second-degree child molestation sexual assault.  The defendant argues on appeal that the trial justice erred by: (1) "restricting [defendant's] right of confrontation and sufficient cross-examination;" and (2) denying his motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The instant case arises as a result of allegations that defendant sexually molested Matthew[1] on four occasions. On November 29, 2016, defendant was indicted by a grand jury on one count of first-degree child molestation sexual assault in violation of G.L. 1956 §§ 11-37-8.1 and 11-37-8.2 for sexual penetration, to wit, fellatio, with a person fourteen years of age or under between January 1, 2012 and May 1, 2012 (Count One). He was also indicted on four counts of second-degree child molestation sexual assault in violation of §§ 11-37-8.3 and 11-37-8.4 for alleged: sexual contact, to wit, hand to penis, with a person fourteen years of age or under between January 1, 2012 and May 1, 2012 (Count Two);[2] between October 31, 2011 and December 25, 2011 (Count Three); between March 1, 2012 and June 1, 2012 (Count Four); and between June 1, 2012 and July 31, 2012 (Count Five).

A trial ensued on various dates in February and March of 2019. We relate below the salient details of what transpired at that trial.

---

[1]    Although the complaining witness was eighteen years old at the time of trial, he was a minor when the alleged incidents at issue occurred. Accordingly, we shall refer to him pseudonymously.

[2]    Following the close of the state's case, the trial justice granted defendant's motion for judgment of acquittal on Count Two on the grounds that the state did not meet its burden of proof as to that count.

# A

## The Trial

### 1. Matthew's Testimony Regarding the Alleged Incidents

On direct examination, Matthew testified with respect to each of the alleged incidents. Matthew stated that he knew defendant because they lived in the same neighborhood in Cumberland, Rhode Island, and that he had been friends with defendant's older twin sons.[3] He said that he used to see the twins at school and that they also spent time together outside of school.

### a. The First Alleged Incident

Matthew testified that, one evening when he was eleven years old, he was "hanging out" with the twins and a number of other friends at defendant's house when the first alleged incident took place. He stated that he and the other children were in the basement watching a movie when the following occurred:

> "[T]he kids were wrestling the Defendant, and they were horsing around. And then when they settled down, some of the kids went upstairs to get snacks, and the Defendant put me on his lap and put his hand down my pants and started playing with me down there for about two minutes."

---

[3] Matthew testified that defendant had four children—two sets of twin boys— and that he and the older set of twins were friends.

Matthew testified that, although he "kept trying to push away and get away," he did not tell defendant to stop because he "didn't know what was going on" and he was "in complete shock." He added that he ultimately "shrugged it off."

### b. The Second Alleged Incident

Matthew testified that he did not return to defendant's house again until the Spring of 2012, at which time the second alleged incident took place. He stated that, when he rang the doorbell to see if his friends wanted to play, defendant answered the door. Matthew testified that, even though defendant said that his children were not home, he nevertheless told Matthew to come inside the house. Matthew stated that he did as he was told and entered the house and went directly to the spare bedroom; he added that defendant followed him and, once therein, "gave [Matthew] oral sex." Matthew testified that, shortly thereafter, defendant walked him to the front door and told him that, if he told anyone about what had taken place, defendant "would * * * hunt [his] father down and hurt him."

### c. The Third Alleged Incident

Matthew testified that the third alleged incident also occurred in the Spring of 2012. He stated that he had been in the living room of defendant's house with defendant's four children and that they had all been playing in the living room and defendant's bedroom. Matthew testified that, at one point that evening, defendant told his children to "get out" of the bedroom, at which point he locked Matthew

inside the bedroom with him. Matthew stated that, when he and defendant were alone, defendant touched his genitals. Matthew testified that, when he left defendant's house after that incident, he went to the home of his best friend and told his friend that defendant had touched him inappropriately and had also threatened him. Matthew added that, although his friend thought that Matthew should tell someone about what had happened, he chose not to disclose any information to anyone else at that time.

### d. The Fourth Alleged Incident

Matthew testified that the fourth alleged incident occurred in the "early summer" of 2012, when he went to defendant's house to see if his friends wanted to play. He stated that, after defendant answered the door and invited him in, he went upstairs to the living room. Matthew testified that, when defendant joined him in the living room, defendant told him to lie on the floor and forced Matthew to touch defendant's genitals. Matthew added that defendant also touched Matthew's genitals. He further stated that, when he yelled out in pain as a result of being touched, defendant "got mad and told [Matthew] to get out of [the] house." Matthew testified that, when he left defendant's house, he "ran home and * * * started cutting [himself]."

Matthew testified that, for several years subsequent to the alleged acts of molestation, he continued self-harming behavior, which led to his hospitalization

on multiple occasions. He stated that, following one such hospitalization in 2015, he began seeing a counselor, one Jennifer Lawrence. Matthew testified that, because he had a "good connection" with Ms. Lawrence, he felt comfortable discussing with her the "molestation incidents." He stated that, after telling her about the four alleged incidents, Ms. Lawrence contacted Matthew's family and the police in Cumberland to report what Matthew had told her. Matthew added that he went to the police station the following week and "recited all [his] incidents with the Defendant."

### 2. The Limitations on the Cross-Examination of Matthew

While cross-examining Matthew at trial, defense counsel attempted to question him as to certain instances of past conduct. In particular, defense counsel stated outside the presence of the jury that he sought to elicit testimony from Matthew to the effect that he had once put peanut butter in the "smoothie"[4] of a person who had a peanut allergy ("the peanut butter incident") because that person had bullied him. Defense counsel intended to use such testimony to challenge Matthew's credibility—namely, to show that Matthew's statements that he was always the target of bullying and was never a bully himself should not be

---

[4] The American Heritage Dictionary defines "smoothie" as a "drink made of fruit or sometimes vegetables, blended with juice, milk, or yogurt and often ice until smooth." The American Heritage Dictionary of the English Language 1655 (5th ed. 2011).

believed.[5]   The trial justice, in prohibiting this line of questioning, stated as follows:

> "I don't think that it comes under 608(b), and I don't think that it goes to the issue of bullying.  Frankly, it goes to the issue of something very different than that.  So I don't think it's an issue of impeachment on a prior inconsistent statement.  So unless you have another rule of evidence, you're not going to get into it."

Defense counsel also attempted to cross-examine Matthew on a topic which we shall refer to as "the Cagno allegation."  During *voir dire* outside the presence of the jury with respect to this proposed line of questioning, Matthew testified that, when he worked as a volunteer at a venue known as "the Stadium Theatre" in 2015, he met a man named John Cagno.  Matthew stated that Mr. Cagno was an employee of the theatre, under whose direction Matthew served as a volunteer.  Matthew testified that, although he had auditioned for the leading role in a play and had expressed to Mr. Cagno his interest in that role, he was not selected to play that part.  Matthew further testified that, several weeks after he learned that he had not been selected for the role in the play, he went to the Woonsocket Police Department and reported that Mr. Cagno "had promised [him] the lead role in return for sexual favors[.]"

---

[5]     It should be noted that those statements regarding always being the target of bullying and never being a bully himself were recorded in Matthew's counseling records, but were not alluded to in the presence of the jury.

When defense counsel informed the trial justice that Mr. Cagno was prepared to testify that nothing of a physical nature ever happened between him and Matthew, the trial justice responded as follows:

> "That's not going to happen. That's going to be a 403 issue. It would be different if in this [police] report [Matthew] recanted, you know, and said, Cagno never tied our relationship to a part. I made that up because I was upset for one reason or another. I don't see it anywhere in this report, and I don't believe he has recanted here today.

> "* * *

> "Right. We're bringing in issues of sexual conduct with someone else, and now we're talking about somebody about four years older, homosexual contact with someone about four years older than he was at the age of 15, not 11. And he says that it was tied to an offer of a part. We're not going to try that case."

Although the trial justice prohibited defense counsel both from further questioning Matthew with respect to Mr. Cagno and from calling Mr. Cagno as a witness, she did permit counsel to make an offer of proof as to what Mr. Cagno would say if permitted to testify. Following defense counsel's offer of proof, the trial justice affirmed her earlier ruling.

### 3. The Jury Deliberations and the Jury Verdict

After the close of evidence and during the jury instructions, the trial justice provided the jury with a verdict form, which included a "questionnaire" that set forth five "questions." The first three questions referenced conduct related to the

first three alleged incidents. However, questions four and five both dealt with Count Five and related to the fourth alleged incident.[6] Shortly after deliberations commenced, the trial justice was informed that the jurors were unable to reach a unanimous decision as to any of the questions on the verdict form. Accordingly, the trial justice opted to deliver an *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 501-02 (1896); *State v. Rodriguez*, 822 A.2d 894, 899-904 (R.I. 2003); *see also State v. Arciliares*, 108 A.3d 1040, 1047 (R.I. 2015). Then, after further deliberations, the jury returned a verdict of not guilty on Count One and guilty on Count Three. It indicated that it was unable to reach a verdict as to Count Four and as to the first question under Count Five. However, it did find defendant guilty on the second question under Count Five.[7]

**B**

**The Motion for a New Trial and the Sentencing**

Thereafter, defendant moved for a new trial as to Counts Three and Five. The trial justice denied the motion for a new trial, finding that the evidence supported the jury's verdict.

---

[6] More specifically, question four asked whether defendant had made Matthew touch defendant's genitals, whereas question five asked whether defendant had touched Matthew's genitals.

[7] We would note that Count Five related to two separate acts, both of which allegedly occurred during the fourth incident. *See* Part II.B.2, *infra*.

The trial justice thereafter sentenced defendant as follows: thirty years imprisonment with twenty-two years to serve and eight years suspended, with probation, on Count Three; and eighteen years suspended, with probation, on Count Five (consecutive to Count Three). The defendant filed a notice of appeal to this Court.[8]

## II

## Analysis

On appeal, defendant argues that the trial justice erred by "restricting [defendant's] right of confrontation and sufficient cross-examination." He also contends that the trial justice erred by denying his motion for a new trial. We are not persuaded by defendant's arguments.

## A

## The Limitations on Cross-Examination

The defendant contends that the trial justice erred by "restricting [defendant's] right of confrontation and sufficient cross-examination." The defendant specifically argues that he should have been permitted to cross-examine

---

[8]     We would note that defendant's notice of appeal was prematurely filed prior to the entry of the judgment of conviction and commitment. However, that fact has no bearing on the validity of the appeal. *See State v. Chase*, 9 A.3d 1248, 1252 n.2 (R.I. 2010) ("Although defendant's notice of appeal was premature, it was nevertheless valid.").

Matthew with respect to the peanut butter incident as well as with respect to the Cagno allegation.

### 1. "The Peanut Butter Incident"

On appeal, defendant argues that, pursuant to Rule 608(b) of the Rhode Island Rules of Evidence,[9] defense counsel should have been allowed to question Matthew regarding the peanut butter incident in order to attack Matthew's credibility—by showing that he was untruthful in his "repeated self-characterization that he was a victim and not a perpetrator of vengeful acts." The defendant argues that cross-examination on this subject would have undermined Matthew's credibility in three important ways. First, defendant alleges, it would have shown that, despite his repeated contention that he was always a victim, Matthew was actually "capable of egregious spite and intentional infliction of harm." Second, it would have demonstrated that Matthew was "certainly capable of disclosing painful or personally uncomfortable truths with his doctors, as evidenced by his disclosure of this 'peanut butter incident'" during counseling

---

[9] Rule 608(b) of the Rhode Island Rules of Evidence states in pertinent part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

sessions. Third, it would have shown that, despite Matthew's testimony that he was receiving treatment as a result of his self-harming behaviors, he was actually receiving treatment "in part due to the threat of criminal charges related to the [peanut butter] incident."

"Both the Sixth Amendment to the United States Constitution * * * and article 1, section 10, of the Rhode Island Constitution guarantee individuals accused of criminal charges the right to confront and cross-examine any adverse witnesses who testify against them." *State v. Manning*, 973 A.2d 524, 530 (R.I. 2009) (quoting *State v. Dorsey*, 783 A.2d 947, 950 (R.I. 2001)). That right, however, "is not unbounded." *State v. Rivera*, 987 A.2d 887, 906 (R.I. 2010) (internal quotation marks omitted). Rather, it "is tempered by the dictates of practicality and judicial economy; trial justices are authorized to exercise sound discretion in limiting the scope of cross-examination." *State v. Danis*, 182 A.3d 36, 40 (R.I. 2018) (quoting *Manning*, 973 A.2d at 530).

The exercise of this discretion, however, "must not unduly restrict a defendant's right to cross-examine." *State v. Anthony*, 422 A.2d 921, 924 (R.I. 1980). We have stated that it is "the essence of a fair trial that reasonable latitude be given the cross-examiner." *Id.* Nonetheless, it is the duty of the court to protect witnesses from questions that "go beyond the proper bounds of cross-examination," including those that "are irrelevant or offer no probative value." *Id.*

This Court will "review [a] trial justice's decision to limit the scope of cross-examination * * * for clear abuse of discretion; the decision will be overruled only if such abuse constitutes prejudicial error." *Rivera*, 987 A.2d at 906 (internal quotation marks omitted).

We are satisfied that it was within the trial justice's discretion to exclude the line of questioning pertaining to the peanut butter incident. During the sidebar conference concerning this proposed testimony, defense counsel indicated that he wanted to question Matthew as to this incident because it would go to Matthew's credibility. In so arguing, defense counsel stated that "[Matthew is] going to say he never bullied anyone[,] yet, he's putting peanut butter in a milk shake to someone who could potentially die." In response, the trial justice ruled as follows:

> "I don't think that it comes under 608(b), and I don't think that it goes to the issue of bullying. Frankly, it goes to the issue of something very different than that. So I don't think it's an issue of impeachment on a prior inconsistent statement. So unless you have another rule of evidence, you're not going to get into it."

We agree with the trial justice's conclusion that, although Matthew's act of putting peanut butter in the smoothie of a supposed bully may arguably relate to some other aspect of his character, it is not probative of his character for truthfulness and does not fall within the bounds of Rule 608(b). In our judgment, said evidence could also have been excluded pursuant to Rule 403. Accordingly, the trial justice did not abuse her discretion in prohibiting cross-examination on this subject.

- 13 -

## 2. "The Cagno Allegation"

The defendant further argues that the trial justice erred by excluding cross-examination with respect to the Cagno allegation. The defendant contends that such testimony relates to Matthew's credibility because it would demonstrate: (1) "whether he was trustworthy in his accusations against [defendant] despite his *demonstrably* misleading accusations against Mr. Cagno;" (2) his "knowledge about sexual acts" despite his young age; and (3) the truthfulness of his claim that "he never disclosed to anyone what [defendant] had allegedly done because he was 'ashamed' and 'uncomfortable,'" despite having made a similar disclosure five months prior. (Emphasis in original.)

We have noted that our rules of evidence "generally treat with disfavor the use of evidence of a witness's prior conduct for the purpose of proving that he or she acted in conformity therewith." *Manning*, 973 A.2d at 531 (quoting R.I. R. Evid. 404(a)). However, pursuant to Rule 608(b) of the Rhode Island Rules of Evidence, subject to a trial justice's discretion, a witness may be questioned during cross-examination on the witness's "prior similar false accusations, if probative of truthfulness or untruthfulness." *Id.* We have also previously held that "evidence of a complaining witness'[s] prior allegations of sexual assault may be admitted to challenge effectively the complaining witness's credibility, even if the allegations were not proven false or withdrawn." *State v. Oliveira*, 576 A.2d 111, 113 (R.I.

- 14 -

1990) (internal quotation marks omitted). But, we have noted that, where such accusations are "fundamentally different" from those in the case at bar, they may not be used. *Dorsey*, 783 A.2d at 951 (internal quotation marks omitted); *see State v. Botelho*, 753 A.2d 343, 347 (R.I. 2000).

We are of the opinion that the trial justice did not abuse her discretion by prohibiting cross-examination of Matthew concerning his prior allegations against Mr. Cagno. We would first note that the trial justice acknowledged that Matthew neither admitted the falsity of the allegations nor recanted the allegations, either to the police or while testifying at trial. *Cf. State v. Dennis*, 893 A.2d 250, 266 (R.I. 2006) (complaining witness admitted prior false claim of rape). We would next point out that, in prohibiting cross-examination on this subject, the trial justice relied on Rule 403 and distinguished the facts of the Cagno allegation from the facts in the instant case. She stated as follows:

> "We're bringing in issues of sexual conduct with someone else, and now we're talking about somebody about four years older, homosexual contact with someone about four years older than he was at the age of 15, not 11. And he says that it was tied to an offer of a part. We're not going to try that case."

After careful reflection concerning this not insubstantial question, we are in the end convinced that the trial justice did not abuse her discretion in excluding cross-examination on the Cagno allegation on the basis of her observation relative to the

"fundamental[] differen[ce]" between those allegations and the allegations against defendant. *Dorsey*, 783 A.2d at 951 (internal quotation marks omitted).

**B**

**The Trial Justice's Denial of the Motion for a New Trial**

The defendant also contends that the trial justice erred in denying his motion for a new trial for two reasons: (1) "[t]he trial justice overlooked and misconceived material evidence in the case;" and (2) "[w]hen the jury returned a verdict as to Count 5, separated into two questions, they returned a legally inconsistent verdict of *guilty* as to one question and *hung* as to the other," which offended defendant's right to due process of law. (Emphasis in original.)

**1. The Alleged Overlooking and Misconceiving of Material Evidence**

With respect to his first argument, defendant avers that the trial justice overlooked three important facts when she "dismissed the possibility that [Matthew] had fabricated the allegations" against defendant on the basis of her understanding that "[t]here was just not evidence that he felt revengeful." He argues first that, because "the jury itself wrestled with [Matthew's] credibility, finding [defendant] not guilty of committing the acts [*sic*] alleged in Count 1, failing to reach a verdict as to part of Count 5, and failing to reach a verdict as to Count 4," the "verdicts [therefore] signal that such a blanket statement was *not* a fair takeaway from his trial testimony." (Emphasis in original.) The defendant

next argues that "the trial justice overlooked the fact that [Matthew] was an aspiring actor and his entire trial presentation read like a play; a play where he forgot many of his lines." His third contention is that the trial justice "overlooked the fact that [Matthew] had a long history of troubling behaviors," which "*predate* any of the allegations against [defendant] and include manipulative conduct such as misleading medical professionals." (Emphasis in original.)

When ruling on a motion for a new trial, the trial justice must perform at least three analyses:

> "First, he or she must consider the evidence in light of the charge to the jury, a charge that presumably is correct and fair to the defendant. Second, he or she must determine his or her own opinion of the evidence, and then weigh the credibility of the witnesses and other evidence and choose which conflicting testimony and evidence to accept and which to reject. Finally, the trial justice must determine whether he or she would have reached a different result from that of the jury based on an individual assessment and in light of the charge to the jury." *State v. DeOliveira*, 972 A.2d 653, 665 (R.I. 2009) (quoting *State v. Rivera*, 839 A.2d 497, 502-03 (R.I. 2003)).

If, at this point in the analysis, the trial justice agrees with the jury's verdict, the verdict should be affirmed. *Rivera*, 839 A.2d at 503. However, "[f]urther analysis must be conducted * * * when the trial justice does not agree with the jury verdict or does not agree that reasonable minds could differ as to the proper disposition of the case." *DeOliveira*, 972 A.2d at 665. "In that event, the trial justice must

- 17 -

determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* "If the trial justice so determines, * * * a new trial should be ordered." *Id.*

In carrying out the just-summarized analysis, the trial justice "need not specifically refer to each speck of trial evidence that might support his or her decision, but need only relate to that evidence, which is sufficient to allow this Court to determine whether the trial justice has undertaken to comply with the applicable standards for his or her decision." *State v. Ramirez*, 786 A.2d 368, 373 (R.I. 2001) (internal quotation marks omitted); *see Rivera*, 839 A.2d at 503. "This Court will not disturb the decision of a trial justice who has employed the above-described analytical approach unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *DeOliveira*, 972 A.2d at 665.

It is our view that, in ruling on the motion for a new trial in the instant case, the trial justice conducted the required analysis, by weighing the evidence adduced at trial and the credibility of the witnesses and choosing which evidence to credit and which to reject. *See id.* The trial justice found that Matthew was "a credible witness" and that, although "[t]here may have been some discrepancies between his trial testimony and details he provided at earlier hearings[,] * * * those discrepancies were not material to the issues set forth in the indictment." She added that, in any event, he adequately explained at least one of those

discrepancies. The trial justice further stated that she found Matthew's testimony to be "detailed and compelling," noting that "[h]e came across as a troubled child from a broken home, one who might well have found the Defendant's home life and the Defendant, as the head of a beautiful nuclear family, quite attractive to a child who might have been vulnerable to advances from a child predator."

Upon concluding her analysis, the trial justice stated that the evidence supported the jury's verdict, and she thereby proceeded to deny defendant's motion for a new trial. Accordingly, we perceive no indication in the record that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong.

## 2. The "Inconsistent Verdicts" Argument

The defendant next argues that it was clear that, because "the jury found that [Matthew] was *not* fully credible as to his recitation of this alleged incident as they failed to reach a unanimous conclusion as to Count 5[,] * * * the entry of conviction as to Count 5 is legally improper." (Emphasis in original.) It should be recalled that, although Count Five of the indictment referenced only one incident—the so-called fourth incident—the jury was asked on the verdict form to separately determine whether, during that incident: (1) defendant had forced Matthew to touch defendant's genitals (question four); and/or (2) defendant had touched Matthew's genitals (question five). The defendant argues on appeal that, because

- 19 -

the jury found defendant guilty of having touched Matthew's genitals, but could not reach unanimity as to whether Matthew had been forced to touch defendant's genitals, the verdicts were "legally inconsistent," thereby offending defendant's right to due process. We are not convinced by defendant's argument.

In support of his argument that the verdicts were legally inconsistent, defendant cites *State v. Arroyo*, 844 A.2d 163 (R.I. 2004). *Arroyo* defines "legally inconsistent verdicts" as those in which "the essential elements of the *count*[] of which the defendant is acquitted are identical and necessary to prove the *count* of which the defendant is convicted * * *." *Arroyo*, 844 A.2d at 171 (emphasis added) (internal quotation marks omitted). The *Arroyo* opinion further states that, when both crimes arise out of the same set of facts, the verdicts are "legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist." *Id.* (internal quotation marks omitted). We would point out that, in the present case, the "legally inconsistent" verdicts with which defendant takes issue deal with only *one count* from the indictment. We would also note that the jury need only have found one of the acts to have occurred—either the act referenced in question four *or* the act referenced in question five—in order to have found defendant guilty of Count Five in violation of § 11-37-8.3. We would add that a failure to find that Matthew was forced to touch defendant's genitals does not negate a finding that

- 20 -

defendant touched Matthew's genitals—in other words, a finding of one but not the other does not "necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist." *Id.* (internal quotation marks omitted). We are of the opinion that the verdicts relating to Count Five are not legally inconsistent and, therefore, do not offend defendant's right to due process.

Accordingly, for the reasons set forth in this section, we affirm the trial justice's denial of the motion for a new trial.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Kunwar Chadha. |
| **Case Number** | No. 2019-438-C.A.<br>(P1/16-3412A) |
| **Date Opinion Filed** | June 25, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Brianne M. Chevalier<br>Department of Attorney General<br>For Defendant:<br><br>Kara Hoopis Manosh, Esq. |